**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**GLOBAL MARINE
EXPLORATION, INC.,**

      **Plaintiff,**               **CASE NO: 4:20-cv-00181-AW/MJF**

**vs.**

**REPUBLIC OF FRANCE,**

      **Defendant.**

_____/

## AMENDED COMPLAINT

Plaintiff, GLOBAL MARINE EXPLORATION, INC. ("GME") brings this action against Defendant, REPUBLIC OF FRANCE, and says:

1.    This action relates to valuable historic shipwreck sites discovered by GME on sovereign submerged lands under authority of the State of Florida's salvage activity program.  France has collaborated with the State of Florida to recover the sites and their value for their own purposes, using GME's confidential locational information, in derogation of GME's rights and entitlements.  GME undertook massive efforts and incurred significant financial expenditure discovering and locating the sites in justifiable reliance upon its program rights being honored and is entitled to relief against France to vindicate its rights under both admiralty law and Florida law.

1

2.     This Court has jurisdiction pursuant to Article III, § 2 of the United States Constitution and 28 U.S.C. § 1330 (a) (2019) providing that the United States District Courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as to claims for relief *in personam* with respect to which the foreign state is not entitled to immunity either under 28 U.S.C. §§ 1605–1607 or applicable international agreement.

3.     Defendant is the Republic of France, a foreign country, that is not entitled to immunity either under federal law or international agreement with respect to the claims for relief *in personam* brought by this complaint.

4.     The Court has subject matter jurisdiction over the claims herein pursuant to 28 U.S.C. § 1605 (2019), because Defendant France is engaging in commercial venture activity in Florida that affects GME.  France's activity is of a nature that private parties would do, regardless of the purpose of the activity, and therefore is commercial activity.[*]

---

[*] *See Republic of Arg. v. Weltover*, 504 U.S. 607, 614 (1992) (Under the FSIA's definition of "commercial activity," whether a foreign government acts out of a profit motive or out of a desire to fulfill "uniquely sovereign objectives" is entirely irrelevant to the analysis of whether an activity qualifies as "commercial." Instead, we must determine "whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce)."

5.     This court has personal jurisdiction over Defendant as a foreign state pursuant to 28 U.S.C. § 1330 (b) (2019) with respect to the claims herein for which the Court has subject matter jurisdiction.

6.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(f) (1) (2019) because a substantial part of the events giving rise to Plaintiff's claims have taken place and will continue to take place in Leon County, Florida, in the Tallahassee Division of the Northern District of Florida.   The events include France's negotiations with the Florida Department of State, Division of Historical Resources, to reach agreement to, and to undertake operations to recover, conserve, study and exhibit in Florida historic shipwrecks discovered by GME; entering into one or more agreements to carry out and implement such operations, and communications relative thereto; and planning, coordinating, and directing work with the State of Florida, Department of State with respect to those activities for mutual benefit.

7.     Plaintiff GME is a Florida corporation that conducted marine salvage activity and discovered historic shipwreck sites in State coastal waters on sovereign submerged lands under authorization agreement with the Florida Department of State, Division of Historical Resources, pursuant to its commercial salvage activity program, and with all other required governmental approvals.

8.     The Florida Department of State, Division of Historical Resources ("DOS") administers historical shipwreck resources on State-owned coastal

submerged lands.  Pursuant to Section 267.031, Florida Statutes, Florida DOS agrees and contracts for commercial salvage activity, *i.e.* survey, exploration, identification, excavation and recovery of historical shipwreck sites by commercial salvors, and for the transfer of resources or value equivalent for their services.

9.     Florida DOS entered into authorization agreements with GME to entitle it to conduct salvage activities in State coastal waters in designated areas off Cape Canaveral, Florida.

10.     The State of Florida, Division of State Lands conferred upon GME a fixed term "cultural resource recovery easement for salvage exploration and operational purposes" for the designated State-owned submerged lands, and the Florida Department of Environmental Protection and the Federal Corps of Engineers issued permits for GME to use designated submerged lands and navigable waters for such construction work.

11.     GME undertook prolonged and expensive research, survey, reporting, and identification of shipwrecked sites and artifacts and contents, with reasonable investment-backed expectation and program assurances that its salvage activity in State waters would be fully compensated based on the value of discovered sites. GME expended millions of dollars and enormous time and effort to survey, discover, locate, identify, analyze, and conserve the historic shipwreck sites and artifacts found.

12.     Beginning in 2014, the Florida DOS agreed with GME for salvage activity related to six different three-square mile areas off the coast of Cape Canaveral for renewable three-year terms.  GME's efforts in these areas turned up some shipwreck evidence (anchors) dating in the 1700s, but mostly resulted in identification of rocket debris.

13.     On August 14, 2015, Florida DOS and GME entered a seventh agreement, being designated Permit No. 2015-03, specifically authorizing GME, on an exclusive term basis, to survey another designated three-square mile area off Cape Canaveral and locate and report any shipwreck sites discovered therein.

14.     Amendment One known as the Dig Addendum was subsequently added, recognizing GME's successful completion of the sensing survey work phase within the exclusive designated area, and specifically authorizing GME to undertake activity to identify newly discovered cultural materials and perform limited test excavation and diagnostic artifact recovery for shipwreck identification purposes, and specifically promising for their value to be pooled with the value of all ultimately recovered objects to calculate 80% thereof to be paid to GME.

15.     GME discovered five separate shipwrecks and six historic shipwreck sites within the exclusive area pursuant to Permit Agreement # 2015-03, as depicted by GME's mapped conclusions attached hereto as **Exhibit 1**.  These mapped

conclusions were provided to the Florida DOS as part of GME's report accompanying its request for promised approval to proceed with recovery.

16.    GME provided its "Final Dig & Identify Report and Request for Rescue Recovery Permit" to the Florida DOS on June 30, 2016.  GME described the various discovered historic shipwreck sites and artifacts; provided diagrams, underwater photographs, field notes, activity logs, inspection reports, archeological research assessment and documentation; and requested specific authorization for rescue/recovery to secure these historically significant artifacts.

17.    GME excavated and was conserving certain small artifact items from its discovered historic shipwreck Site #2, and provided the Florida DOS with photographic and video identification of certain cannons and monuments from that Site.  These were relied on by the Florida DOS and Defendant France to surmise that shipwreck Site # 2 was probably the historic French vessel *la Trinité*, which was involved in French Huguenot resettlement and sank off the Florida coast below St. Augustine during a hurricane in 1565.

18.    GME's Final Dig and Identify Report submitted to Florida DOS did not include the precise data coordinate locations of any of the discovered historic shipwreck sites, but noted that in accordance with GME's research design plan of September 27, 2015 that: "GME will record every find with precise measurements singularly, and as a whole, sites to include . . . "description, compass heading, depth

of waters, depth of overburden (sand, mud, mud clay, etc.), size, length, width, height, type of material, quality, condition, etc.  This will include drawings and maps.  In this way, the site plan of each site(s) will be compiled and recorded."

19.    The precise coordinate locations of the historic shipwreck sites discovered by GME and the methods GME used to identify those locations were owned by GME, and were considered proprietary, confidential trade secret information so maintained by GME.  There was no requirement or agreement for public disclosure of this confidential information which was exempt from under Florida's Public Records Act.  The confidentiality of the information and GME's entitlement for it to be maintained confidential was made known in writing to Florida DOS and confirmed as such by its personnel.

20.    Although GME was directed to submit the location coordinate information to the Florida DOS incident to that agency's oversight and inventory of historical resources, the information was to remain confidential, to be used commercially only by GME upon its full recovery of the shipwreck sites.

21.    The Florida DOS never raised any issue or ever commented or suggested that GME had improperly proceeded; nor had the Florida DOS ever indicated any reason or justification that GME would not be specifically authorized to fully recover its various shipwreck site finds and retain 80% of their value.

22.     To the contrary, in July 2016, the Secretary of State of Florida spoke with GME by telephone, with an Assistant Secretary and the Director of the Division of Historical Resources on the call, and assured GME that the Florida DOS would be "partnering" with GME in the full recovery of the GME discovered shipwreck sites.

23.     Subsequently, however, GME learned the Florida DOS was collaborating and negotiating with France to recover the shipwreck sites without GME's involvement, surmising that Site # 2 was an abandoned French shipwreck *la Trinité*.

24.     GME became concerned, and in September 2016, filed a federal court *in rem* admiralty action against "The Unidentified, Wrecked and (for Finders-Right Purposes) Abandoned Sailing Vessel," in an attempt to protect its supposed ownership interest of the Site # 2 shipwreck under the Law of Finds (that actually applies in international waters, but not for State owned coastal waters).  The Florida DOS and France became parties to that action.

25.     Incident to filing the *in rem* action, GME deposited with the federal court several small artifacts (ballast stones, pics) from shipwreck Site # 2 that GME had recovered and was properly conserving.  Deposit of these items was required by admiralty law to confer constructive possession upon the federal court of the

shipwreck Site # 2 vessel to arrest that ship to vest admiralty *in rem* subject matter jurisdiction.

26.   In early October 2016, the Florida DOS demanded that GME immediately turn over those small recovered artifacts to DOS, although the federal court controlled them.  The Florida DOS then "suspended" GME's salvage activity permit # 2015-03 and refused to allow GME to proceed with full recovery of its discovered historic shipwreck sites, stating that the only cure was for GME to deliver the small recovered artifacts to it forthwith.

27.   The federal court magistrate judge assigned to hear the *in rem* action subsequently transferred control of the small artifacts to the Florida DOS, fulfilling this demand.  However, Florida DOS still refused to allow GME to recover any of the shipwreck sites.

28.   The federal court magistrate judge subsequently conferred temporary *in rem* custody to DOS during the admiralty case and precluded any shipwreck site recovery pending its decision as to ownership entitlement.

29.   Almost two years later, on June 29, 2018, the federal magistrate judge granted France's Motion to Dismiss the *in rem* admiralty action for lack of federal court subject matter jurisdiction over the vessel (shipwreck Site # 2) because France had a colorable claim to the vessel as being the *la Trinité* that sank in 1565 south of St. Augustine.

30.     Pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.A. § 1609, federal courts do not have subject matter jurisdiction to arrest a *res* that is colorably claimed by a foreign government, and any such vessel is immune from federal court *in rem* adjudication or disposition.

31.     The federal court magistrate hearing the *in rem* action determined that under FSIA, the federal district court had no subject matter jurisdiction to proceed to determine any ownership interest entitlement to the constructively arrested shipwreck vessel.  The magistrate judge dismissed the entire case for lack of subject matter jurisdiction, with direction for the Court's constructive custody of the *res* (presumed to be the vessel *la Trinité*) to be returned to France, or retained by the State as agreed by France, and with recovery now being allowed.  The magistrate's order of dismissal is found at *Global Marine Exploration, Inc. v. The Unidentified, Wrecked and (For Finders-Rights Purposes) Abandoned Sailing Vessel*, 348 F. Supp. 3d 1221 (M.D. Fla. 2018).

32.     The decision of the federal court magistrate to dismiss the *in rem* action for lack of subject matter jurisdiction under the FSIA is <u>not</u> *res judicata* of any ownership or beneficial interest entitlement to any of the historic shipwrecks sites discovered and located by GME.  The magistrate judge's decision could not and did not purport to determine GME's rights, including its right to benefit from its finds or to receive fair compensation for its efforts and expertise.

10

33.     In December 2018, France entered into a Declaration of Intent with the Florida DOS providing for their recovery of the shipwreck sites discovered by GME, and for recovered materials to be conserved and displayed for the benefit of the public in Florida on a long-term basis.  In the recovery of the historic shipwrecks, France will participate in their study, preservation, consultation and evaluation, as well as the mobilization and oversight of public and/or private resources and organizations to fulfill the Declaration's objectives.  A copy of the Declaration of Intent is attached hereto as **Exhibit 2**.

34.     Actions and agreements by France with the Florida DOS and others subsequent to the Declaration confirm and implement France's declared undertakings.

35.     A France-Florida Steering Committee, including six representatives of France and two representatives of Florida, was organized to implement the Declaration agreement.

36.     France is sending missions to Florida to oversee the project and provide scientific expertise, and work is on-going.

37.     France is performing commercial activity in the State of Florida through agreement with Florida DOS and others, and by activities undertaken or to be undertaken, in relation to GME's discovered shipwreck sites for which GME claims rights and interest.

## COUNT I
## IN PERSONAM LIEN AWARD

38.    GME alleges paragraphs 1-37 above, as if rewritten herein.

39.    GME is entitled to a salvage and/or maritime lien under federal admiralty law, enforceable *in personam* against France to compensate GME's authorized services in the discovery, location, identification, or mapping of the shipwreck sites being recovered by France in connection with its joint undertaking with the Florida DOS.

40.    Under federal admiralty law, GME is entitled to be compensated for its beneficial services performed and authorized by the State of Florida as owner of the submerged sovereignty land where the historic shipwrecks were found and as their putative owner under the Abandoned Shipwreck Act of 1987.

41.    The full recovery of the historic shipwreck sites will significantly benefit from GME's services.  Without GME's services, those shipwreck sites would not have been discovered, located, or identified, and could not be recovered.

42.    Because the shipwreck sites will be recovered at the direction of France and with its participation and assistance under claim of ownership, GME is entitled to enforce a salvage and/or maritime lien *in personam* against France for GME's assistance in ultimate recovery of the shipwreck sites.

43.    GME secured and funded all equipment and personnel, and covered all related expenses over an extensive period in prolonged search and location efforts,

and GME's claim includes compensation in relation to its expenses incurred and time and effort expended.

44.    GME's claim seeks compensation for the value of its services, including compensation for the risk involved in its operations and the skill with which they were performed.

45.    In addition, GME's claim for compensation must be determined in relation to the anticipated market and historic value of recovery made or to be made with respect to the shipwreck sites.

WHEREFORE, GME requests declaration that it is entitled to a salvage or maritime lien award against France to compensate for GME's services for the recovery of the historic shipwreck sites, and that GME be awarded full compensation for its services consistent with law, and for such other and further relief related thereto as appropriate.


## COUNT II
## QUASI CONTRACT/UNJUST ENRICHMENT

46.    GME alleges paragraphs 1-37 and 43-45 above, as if rewritten herein.

47.    Under Florida law, GME is entitled to enforce a claim for unjust enrichment or *quantum meruit* against France, *i.e.* by contract implied at law for the

value of GME's services benefitting France and the property that France is recovering.

48.    Obligation to fairly compensate another is created under Florida law where one is unjustly enriched by receiving a benefit under circumstances that make it unjust without giving fair compensation.

49.    GME conferred a substantial benefit upon France in respect to historic shipwreck sites that France is recovering or will recover, and France knows of and has accepted or retained the benefit without paying for its value.

WHEREFORE, GME requests payment for the value of its efforts and services that were recognized and accepted by France and substantially benefit France in the recovery of the historic shipwreck sites.

## COUNT III
## MISAPPROPRIATION OF TRADE
## SECRET INFORMATION

50.    GME alleges paragraphs 1-37 above, as if rewritten herein.

51.    GME engaged in extensive and highly costly operations in order to find and locate the various historic shipwreck sites, and had significant investment-backed expectation of its determinations of where such sites were and how they could be found.  The precise locations of GME's discovered shipwreck sites and the methods used to identify those locations were proprietary and confidential

information owned by GME, to be used solely for GME's commercial benefit in connection with its completion of recovery of the sites and otherwise.

52.   GME's precise coordinate location data was trade secret information, as defined by Florida Statutes §§ 815.045 and 812.081(1)(c) to include proprietary information made confidential and exempt from the public records law, and as defined by Florida Statute § 688.002(4)(a) to include a method, technique, and process that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

53.   Before providing its locational coordinate proprietary information to the Florida DOS at the insistence of its Director of the Division Historical Resources, GME repeatedly emphasized and specified in writing that the locational information was confidential and protected, and made reasonable efforts under the circumstances to maintain its secrecy and confidentiality.   GME was assured by the Division Director in writing and otherwise that the information was exempt from public disclosure and would be protected.

54.   GME's proprietary locational data was confidential information exempt from Florida's Public Records Act and protected from public disclosure, misuse, exploitation or beneficial gain by the Florida DOS or by or for anyone else.

55.    The Florida DOS received GME's confidential locational information under a duty to maintain its confidentiality and limit its use solely for official oversight purposes by the Division of Historical Resources to verify and inventory the historical shipwrecks on State-owned submerged lands and monitor GME's anticipated recovery.

56.    GME received assurances from the Florida DOS that GME would be authorized to complete its salvage activities and recover the shipwreck sites it had discovered and located.   However, after DOS came into possession of GME's confidential proprietary information, it began working with France to jointly recover the shipwreck sites.   Relations with GME were discontinued, and GME was not allowed to complete recovery of any of its finds.

57.    In connection with its salvage activity in Florida, France has used and continues to use GME's confidential, proprietary information as to the precise location of the historic shipwreck sites for its own benefit, gain or enhancement, to the detriment of GME's right to exclusive commercial use and benefit.

58.    France's use of GME's proprietary information is unauthorized and without GME's consent, and constitutes misappropriation of GME's trade secret property.

59.    France's misuse and misappropriation of GME's trade secret information is part of the commercial activities conducted by France in Florida, and

allowed France to conduct its recovery operations under direction of the Joint Steering Committee.

WHEREFORE, the Court should determine that GME's proprietary information was misused and misappropriated by France without GME's consent in violation of its rights under law, and should award GME all damages, compensation, and attorneys' fees allowed by law, and further relief as appropriate.

## COUNT IV
## INTERFERENCE WITH RIGHTS AND RELATIONS

60.     GME alleges paragraphs 1-37 above, as if rewritten herein.

61.     A statutory program is recognized under Florida law for commercial salvage activity with respect to historic shipwreck sites in Florida coastal waters.

62.     Pursuant to Florida DOS' Rules, adopted as Chapter 1A-31, F.A.C., a commercial salvor, upon written documentation may apply to the Florida DOS to search for, locate, identify, conserve and recover on an exclusive basis archeological material from historic shipwreck sites in a designated area.  A historic shipwreck site is the remains of an abandoned ship at least 50-years old, including hardware, cargo, personal items and treasure trove.  The salvor must demonstrate financial ability and suitable qualifications; that it has engaged a professional archaeologist; that professionally accepted techniques will be utilized for exploration, identification, recovery, researching, conservation or stabilization of archaeological materials; and

17

present adequate plans for analysis and curation of all recovered materials. The Florida DOS agrees with the Salvor for an exclusive 3-year term with a 3-year renewal term. An exploration permit authorizes collection of sensing and visual information of potential historic shipwreck sites without excavation and bottom disturbance, modified to allow such disturbance and excavation to determine the presence and value of potential historic shipwreck sites. A recovery permit follows after the existence and nature of a historic shipwreck has been documented. These matters are directed per Rules 1A-31.0015, 1A-31.050, 1A-31.0062, 1A-31.0082 and 1A-31.040.

63.     The Florida DOS is obliged to approve an authorized salvor's excavation and recovery of artifacts that will assist in the identification of age and type of historic shipwreck site being investigated pursuant to exploration authority. For approval of ultimate recovery of an identified site, the Florida DOS commercial salvage program requires an approved research design and description of proposed excavation activities prepared by the project archaeologist and other documentation, as directed by Rules 1A-31.060, 1A-31.065, and 1A-31.070.

64.     And per its Rule 1A-31.090, DOS ensures that archaeological materials are transferred to the authorized salvor who receives approximately 80% of recovered archaeological materials with DOS receiving approximately 20%, with distribution of such recovered materials based on historical value.

65.     The Florida DOS was authorized by law to confer rights and privileges upon GME for salvage activity in the State's coastal waters on an exclusive basis, which precluded such activity of any third-party salvager, namely France.

66.     DOS' salvage activity program established a contract under law with GME upon DOS' acceptance of GME to conduct commercial salvage activity on state submerged coastal lands.  GME enjoyed advantageous business relations with the Florida DOS pursuant to its salvage activity program that should have enabled GME to recover and benefit from its finds.

67.     DOS was obligated pursuant to its Rules to authorize GME to recover its discovered and documented shipwreck sites that were reasonably recoverable under GME's archaeologist prepared excavation design.

68.     GME's Permit agreement #2015-03 with the Florida DOS, inclusive of DOS' rules incorporated therein, also established a salvage activity contract, signed by both parties and containing mutual promises, obligations, and benefits, including promise for GME to salvage and benefit from its documented finds by recovery authorization upon reasonable action plan.

69.     The various historic shipwreck sites found by GME pursuant to its agreement with the Florida DOS were abandoned property that could be recovered by GME consistent with its relations with the Florida DOS.

70.    Even if shipwreck Site # 2 were a French vessel known as *la Trinité*, still the Florida DOS could authorize its salvage recovery by GME because that vessel was used for commercial purposes, to wit: the colonization of French Huguenots (a religious ministry), which was an activity that private persons engage in, so that Site # 2 was not a foreign military vessel protected from recovery without France's consent under the Sunken Military Craft Act.

71.    France knew of GME's contractual rights and advantageous relations with the Florida DOS, but nevertheless acted to influence, induce and collaborate with the Florida DOS for it to abrogate its obligations to and favorable relations with GME, even though France was not a privileged party to GME's relations with the Florida DOS.

72.    By its actions and activities taken, with respect to the historic shipwreck sites discovered by GME, France intentionally interfered with GME's business and contractual relations with the Florida DOS and with GME's rights to recover its discovered shipwreck sites and to receive their beneficial value, resulting in damages to GME.

WHEREFORE, the Court should determine that France wrongfully interfered with GME's contractual rights and business relations with the Florida DOS, and award GME damages, and provide further relief as appropriate.

Dated this 17th day of April, 2020.

*s/ Jennifer A. Winegardner*
JENNIFER A. WINEGARDNER
Florida Bar No. 133930
KIMBERLY A. GRIPPA
Florida Bar No. 123587
**WINEGARDNER LAW**
2852 Remington Green Circle
Suite 102
Tallahassee, FL  32308
Telephone:  (850) 270-9064
jwinegardner@winegardnerlaw.com

*s/ M. Stephen Turner*
M. STEPHEN TURNER, P.A.
Florida Bar No.  095691
P.O. Box 10261
Tallahassee, FL 32302
Telephone:  (850) 545-1061
Mstephenturner.pa@gmail.com