## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**GLOBAL MARINE EXPLORATION,**
**INC.,**

     **Plaintiff,**

**v.**                            **Case No. 4:20-cv-181-AW-MJF**

**REPUBLIC OF FRANCE,**

     **Defendant.**

_____/

## <u>ORDER GRANTING MOTION TO DISMISS</u>

In 1565, Jean Ribault led a French Royal Navy Fleet to resupply a fort near present-day Jacksonville. *Glob. Marine Expl., Inc. v. The Unidentified, Wrecked & (for Finders-Right Purposes) Abandoned Sailing Vessel* (*GME I*), 348 F. Supp. 3d 1221, 1228-33 (M.D. Fla. 2018). The flagship of Ribault's fleet was the vessel *la Trinité*. At the time, France was hoping to colonize Florida. Spain was too, and it sent a fleet to find Ribault. The fleets encountered one another near St. Augustine inlet, and Spain drove Ribault's ships out to sea. With the French fleet anchored at sea, a hurricane struck, destroying the fleet and its flagship *la Trinité*. The *la Trinité* lay on the ocean floor for nearly 500 years before Plaintiff Global Marine Exploration, Inc., (GME) recently found it. *Id.*

GME, as its name would suggest, is in the business of marine exploration. In 2015, it secured a permit from the Florida Department of State to conduct salvage

1

activities off the coast of Cape Canaveral. ECF No. 3 (FAC) ¶¶ 13-14. GME discovered several shipwrecks (*id.* ¶¶ 15-17) and filed an *in rem* action for possession of its discovery, claiming ownership and salvage rights. *GME I*, 348 F. Supp. at 1224, 1227-28. Based on earlier discussions with Florida, GME believed it would keep eighty percent of what it recovered, with Florida taking the rest. FAC ¶¶ 14, 21, 64. But France learned of GME's discovery and intervened in the *in rem* action, claiming the *res* was *la Trinité* and therefore sovereign French property. *GME I*, 348 F. Supp. at 1224. And after reviewing a substantial record of historical evidence, the district court agreed. It concluded that the *res* was indeed *la Trinité*, that France had the exclusive claim to it, and that the court thus lacked subject matter jurisdiction. *Id.* at 1242. It dismissed the case, and GME did not appeal.

France, meanwhile, entered a declaration of intention with the Florida Department of State to "[r]ecover this historical and cultural heritage"; "[p]romote the common history of the United States and France in Florida"; and study and preserve the vestiges of *la Trinité*. ECF No. 3-2 at 1-2. It did so consistent with Section L522-1 of the Heritage Code of France, which makes such activities the responsibility of the Ministry of Culture. ECF No. 13-1 ¶ 4.[1] The idea was that

---

[1] In addition, France is a party to the 2001 UNESCO Convention on the Protection of the Underwater Cultural Heritage, which precludes France from commercially exploiting its underwater cultural heritage. ECF No. 13-1 ¶ 5.

France and Florida, working together, would protect, recover, preserve, and study *la Trinité*, and promote their shared history. *Id.*

That all led to this case, which involves many of the same facts as *GME I*, but which presents a different jurisdictional question. The earlier case was an *in rem* action against the property; this is an *in personam* action against France.[2] GME no longer asserts any claim to the ship itself; it has sued France for damages relating to its efforts and the benefits those efforts conferred on France. GME presents four claims: (1) *in personam* lien award, (2) quasi contract/unjust enrichment, (3) misappropriation of trade secrets, and (4) interference with rights and relations. FAC at 12-20. GME seeks to recover its investment in finding *la Trinité*. *Id.* ¶ 1.

France moved to dismiss, arguing that the court lacks jurisdiction. ECF No. 13. Having considered the evidence submitted and the parties' arguments, I conclude that France is correct. The Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, deprives this court of subject matter jurisdiction, so the case must be dismissed.

---

[2] An *in rem* action is "prosecuted to enforce a right to *things*." *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 957 (4th Cir. 1999) (quoting *The Sabine*, 101 U.S. 384, 388 (1879)). An action is *in personam* if it charges an individual personally. *Id.* A judgment in an *in rem* action affects "only the property before the court," while *in personam* actions "adjudicate the rights and obligations of individual persons or entities." *Id.*

## I.

France's jurisdictional challenge is a factual challenge, which means the court may consider matters outside of the pleadings. *Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1169 (11th Cir. 2011). The allegations in GME's complaint need not be accepted as true, and evidence is not viewed in the light most favorable to GME. *Id.*; *see also Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009).

Both parties have submitted evidence. France filed a declaration from Florence Hermite, a Magistrate Judge of the Republic of France and Attaché for Legal Affairs of the Embassy of France to the United States of America. ECF No. 13-1. GME filed public website information about private marine archaeological recovery projects (ECF No. 16), emails and documents produced from a Florida public records request (ECF No. 17), GME's operating officer's affidavit (ECF No. 18), and a statement from Dr. Robert H. Baer, a professional archaeologist (ECF No. 19).

I considered all the documents. I also considered the attachments to GME's complaint, including the declaration of intention France and Florida entered (ECF No. 3-2). The parties confirmed at the telephonic hearing that there were no material factual disputes and that no evidentiary hearing was needed. *See also Odyssey*, 657

F.3d at 1170 (finding it within the court's discretion to determine if an evidentiary hearing is needed on a Rule 12(b)(1) factual challenge).

## II.

The Foreign Sovereign Immunities Act (FSIA) "provides the sole basis for obtaining subject matter jurisdiction over a foreign sovereign in the United States." *Guevara v. Republic of Peru*, 468 F.3d 1289, 1294 (11th Cir. 2006). Under the FSIA, foreign states are generally immune from jurisdiction, 28 U.S.C. § 1604, but there are exceptions. Under the relevant exception here, there is no immunity if "the action is based upon a commercial activity carried on in the United States by the foreign state." *Id.* § 1605(a)(2).[3] GME says the exception applies and the court has jurisdiction. ECF No. 20 at 1-2. France says the exception does not apply and there is no jurisdiction. ECF No. 13 at 14-16.

For our purposes, the first clause of § 1605(a)(2) breaks down into three parts: whether (1) "the action is based upon" (2) "a commercial activity" (3) "carried on in the United States by the foreign state." The Supreme Court has provided guidance on the meaning of the first two parts (see below), and the third part is straightforward and not contested here. France has entered a declaration of intention with Florida. ECF No. 3-2. It is a foreign state carrying on activity in the United States. The

---

[3] There are three different commercial-activity exceptions in § 1605(a)(2). GME relies solely on the exception in the first clause, quoted above. *See* ECF No. 20 at 1, 5-6.

questions, then, are (i) whether that activity is commercial in nature, and (ii) whether GME's action is based upon that activity. I find against GME on both.

### A.

The crux of GME's argument is that France engaged in commercial activity through its "marine archeological recovery project in Florida, undertaken upon negotiation and agreement with the Florida Department of State, and involving agreements with others, fundraising, task coordination, etc., for recovery, study, conservation, and museum displays in Florida of valuable historical artifacts excavated from the historic shipwreck sites." ECF No. 20 at 2. The first question is whether this constitutes "commercial activity."

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). It further specifies that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* The statutory definition, though, "leaves the critical term 'commercial' largely undefined." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612 (1992). But in *Weltover*, the Court concluded that "the meaning of 'commercial' is the meaning generally attached to that term under the restrictive theory at the time [the FSIA] was enacted." *Id.* at 612-13. It held "that when a foreign government acts, not as regulator of a

market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Id.* at 614. It also cautioned against considering whether the sovereign's motives are profit driven or uniquely sovereign objectives, indicating instead that the "issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.*

Applying this standard, the Court concluded in *Weltover* that Argentina engaged in commercial activity by issuing bonds to private parties and then changing the terms of those bonds. *Id.* at 615, 620. The bonds were "garden-variety debt instruments" traded in international markets, and nothing about their issuance by a government changed their commercial nature. *Id.* at 615. Applying this same standard here, I conclude France's intergovernmental declaration with Florida—and its overall relationship with Florida regarding the shipwreck sites—lacks such a commercial nature.

France is not involved in "the *type* of actions by which a private party engages in 'trade and traffic or commerce'" *Id.* at 614. It is not interacting with markets or commerce the way a private actor would. *See Guevara*, 468 F.3d at 1298 ("We read *Weltover* to mean that a foreign state is commercially engaged when it acts like an

ordinary private person, not like a sovereign, *in the market*." (cleaned up) (emphasis added)); *accord Odyssey*, 657 F.3d at 1177.

It is true, as GME argues, that private actors sometimes engage in marine exploration activities and shipwreck recovery and preservation efforts. But that alone does not make the nature of France's activities commercial. It is not that an act is commercial unless *only* a sovereign can do it at some abstract level. *Contra* ECF No. 20 at 2, 12, 14-15. GME, for example, acknowledges that mail delivery can take both a governmental and commercial form. *See id.* at 22 n.3. And "[o]ther activities undertaken by a foreign state, although generally resembling conduct routinely engaged in by private parties, may also be labeled 'governmental' and immune from suit under the FSIA." *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 579 (7th Cir. 1989). As just one example, "although private entities often rehabilitate buildings to serve as office space, a foreign state's remodeling and operation of a chancery building is not a 'commercial' act, since the construction and operation of a diplomatic office are peculiarly sovereign activities." *Id.*

As another example, in *Saudi Arabia v. Nelson*, the Supreme Court found no commercial activity after government forces arrested and tortured the plaintiff, concluding this was an abusive exercise of state police powers. 507 U.S. 349, 361 (1993). At the same time, the concurrence noted that the plaintiff could have been

arrested and tortured by private security personnel. *Id.* at 366 (White, J., concurring). There was a commercial way to achieve the same result, but Saudi Arabia's actions did not take that form, and that is what mattered. *Id.*; *see also Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 562 & n.6 (2d Cir. 2020).

Here, the nature of France's activity is the recovery and disposition of its own sovereign military property. If it chooses to recover its property, or if it chooses to work with Florida to preserve it, France is not entering a market and behaving as a private person would. The declaration of intention shows that two government actors are working together to protect, recover, preserve, and study *la Trinité*, and to promote their shared history. ECF No. 3-2 at 1-2. The declaration is signed by government officials, and the individuals involved—such as the French ambassador in Washington, D.C., the French consul general in Miami, and Florida's Secretary of State—are government officials. *See id.* at 2. No one has entered the market or engaged in trade or commerce.

Similarly, the public records GME filed show discussions about the "scientific and ethical investigation of the wreck(s)," the "protection of the site," and the "public education that accompanies such work." ECF No. 17-1 at 5. This sentiment is repeated in Hermite's declaration. *See* ECF No. 13-1 ¶¶ 4-6. There, Hermite notes that "[t]hese activities are undertaken as government functions that are within the responsibility of the Ministry of Culture under the Heritage Code of France Section

L522-1." *Id.* ¶ 4. That law "prescribes measures aimed at the detection, conservation of safeguarding by scientific study of the heritage archaeological." *Id.* (translated).

It also matters to some extent that France's agreement is with Florida and not a private actor. *Cf. Guevara*, 468 F.3d at 1292, 1299-1300 (finding that Peru engaged in commercial activity when it offered to reward private parties for information relating to a fugitive); *Honduras Aircraft Registry, Ltd. v. Gov't of Honduras*, 129 F.3d 543, 547 (11th Cir. 1997) (finding that Honduras engaged in commercial activity when it "ventured into the marketplace" and contracted with private parties for their expertise in establishing a modern civil air program). By engaging with Florida, and not a private actor, France has not ventured out into the marketplace. *Cf. Guevara*, 468 F3.d at 1297 ("Commercial activities and private activities are often spoken of together and in a way that distinguishes them from sovereign or public acts.").

The conclusion that France's activities are not commercial finds further support in the Second Circuit's recent conclusion that Greece did not engage in commercial activity when it claimed ownership of an ancient Greek figurine and sent a letter to Sotheby's to prevent the relic's sale. *Barnet as Tr. of the 2012 Saretta Barnet Revocable Tr. v. Ministry of Culture & Sports of the Hellenic Republic*, 961 F.3d 193, 195, 197-98 (2d Cir. 2020). In that case, the court found that Greece was acting pursuant to the country's patrimony laws in declaring the artifact Greek

property. *Id.* at 195, 200-03. While sending a letter to Sotheby's "was an act that a private party may typically undertake in the marketplace," the letter could not rightly be characterized as commercial activity when its nature was based in the sovereign act of Greece's adopting and enforcing patrimony laws. *Id.* at 200-01. Likewise, though "claiming ownership or encouraging cultural heritage are not uniquely sovereign activities," they are when "connected to the sovereign activity of claiming ownership through nationalization and enforcement of patrimony laws." *Id.* at 202. Here too, while entering a contract relating to shipwreck recoveries *can* be a commercial activity, the nature of France's agreement with Florida lacks commercial characteristics.

Last, this case is unlike *Pablo Star*, on which GME relies.[4] *See* ECF No. 20 at 13. In *Pablo Star*, the plaintiff sued the Welsh Government for copyright infringement after it used the plaintiff's photos to promote tourism. 961 F.3d at 559. The court found Wales had engaged in commercial activity, notwithstanding the Welsh Government's argument that it was "acting to promote Welsh culture and tourism pursuant to its statutory mandate under the Government of Wales Act 2006."

---

[4] GME cites a host of cases that reiterate *Weltover*'s commercial-activity analysis, but none have facts similar to our case. *See* ECF No. 20 at 11-15; *see also* ECF No. 26. For example, many involve contracts between private plaintiffs and government defendants. *See id.* The issues presented in *Pablo Star* are closest to those presented here.

*Id.* at 562. The court determined that this broad framing of the Welsh Government's activities focused on its purpose, not its nature. *Id.* at 562. The nature of the Welsh Government's activities was advertising. It was reaching out into the market to encourage private actors to visit Wales. *See id.*

France has done nothing like what the Welsh Government did. Instead, it engaged with another state actor to perform activities pursuant to government mandates. It has not entered a market or engaged in trade or commerce, and its actions are not aimed at influencing the commercial activities of private parties like they were in *Pablo Star*.

In short, I conclude that France's activities are not commercial in nature.

## B.

Next, though my conclusion that France's activities are not commercial is enough to end the jurisdictional inquiry, I also find that even if France's activities are commercial, GME's case is not "based upon" those activities.

In *Nelson*, the Court found that the statutory phrase "based upon" "denot[es] conduct that forms the 'basis,' or 'foundation,' for a claim." 507 U.S. at 357 (citing Black's Law Dictionary 151 (6th ed. 1990)). It said that "based upon" "is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Id.* In that case, the plaintiff sued Saudi Arabia, contending the FSIA's commercial-activity exception applied because he was

employed by a government hospital. *Id.* at 352-53, 358. But the Court concluded that the action was not *based upon* that employment. Rather, the plaintiff's action was based upon his arrest and torture, which arose from the state's exercise of its police powers—not the employment arrangement. *Id.* at 361. The commercial activity (his hospital employment) may have led to his injury, but his injury was ultimately based upon noncommercial activity (his arrest and torture by government police). *Id.* at 358.

Building on *Nelson*, the Court clarified in *OBB Personenverkehr AG v. Sachs* that in determining what an action is "based upon," courts should not do "an exhaustive claim-by-claim, element-by-element analysis" or consider matters like choice of law. 577 U.S. 27, 34 (2015). Instead, "an action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit." *Id.* at 35. In other words, courts must zero in on the "core" of the suit. *See id.*

In *Sachs*, the plaintiff sued Austria after she was injured while boarding a train there. *Id.* at 30. As for commercial activity, she pointed to her purchasing a Eurail train pass in the United States. *Id.* at 35-36. But the Court found that her suit was not based on this activity. *Id.* Instead, it concluded that the gravamen of her suit occurred abroad; the "foundation" for her injury remained in Austria. *Id.*

Here, the foundation for GME's injury is not France's declaration with Florida, or activities related to that declaration. GME is not injured because France

wishes to preserve its culture or recover shipwreck artifacts. GME would be in the same position it is now regardless of France's agreement with Florida. GME's action is based upon the fact that France took ownership of the ship. But that loss (if there were any) occurred the moment the Middle District concluded that the *res* was *la Trinité* and belonged to France. It was at that moment that GME lost any rights to its own discovery.

At bottom, GME's action is based upon the fact that it did all the work to find the site and has nothing to show for it, while France enjoys the benefit of GME's discovery. *See* FAC ¶¶ 41-45, 47-49; *see also Williams v. Nat'l Gallery of Art, London*, No. 16-CV-6978 (VEC), 2017 WL 4221084, at *7 (S.D.N.Y. Sept. 21, 2017) (finding that the core of the suit was a title dispute over a painting and was not "based upon" the commercial activity of a refusal letter sent from London to New York), *aff'd sub nom. Williams v. Nat'l Gallery, London*, 749 F. App'x 13 (2d Cir. 2018). GME's asserted injury stems not from France's activities but from GME's inability to claim ownership of the *res*. This is an independent reason why the commercial-activity exception does not apply and why the case must be dismissed.

## III.

The § 1605(a)(2) commercial-activity exception does not apply. This means the court lacks subject matter jurisdiction. France's Motion to Dismiss (ECF No. 13)

is therefore GRANTED. The clerk will enter a judgment that says, "This case is dismissed without prejudice for lack of subject matter jurisdiction." The clerk will then close the file.

SO ORDERED on November 16, 2020.

_s/ Allen Winsor_____
United States District Judge